UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                        :

                                                :

            - v -                               :

                                                :        **25 CR 665 (NRB)**

**DAVID ALMANZAR,**                             :
            Defendant.                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## SENTENCING MEMORANDUM
## ON BEHALF OF DAVID ALMANZAR


TAMARA L. GIWA, ESQ.
Federal Defenders of New York
Attorney for Defendant
**DAVID ALMANZAR**

52 Duane Street, 10th Floor

New York, NY 10007

Tel.: (212) 417-8735

**Zawadi Baharanyi**, Esq.
Of Counsel


TO:        Jay Clayton, Esq.
           United States Attorney
           Southern District of New York
           26 Federal Plaza
           New York, NY 10278

Attn:      Timothy Ly, Esq.
           Assistant United States Attorney

1

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

March 16, 2026

**BY ECF**

Honorable Naomi Reice Buchwald
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

> **Re:    United States v. David Almanzar**
>
> **25 Cr. 665 (NRB)**

Honorable Judge Buchwald:

On most days, David is a kind, smart, and bright young man, eager to face the day. This is in spite of the fact that he has been hearing voices and experiencing delusions since he was at least 10 years old, a result of his schizoaffective disorder. Fortunately, when David takes his medication, his mental disorder is barely noticeable to those around him. *See* Ex. A at 1. When he is not taking his medications, however, the voices and paranoia get the best of him, causing him to act irrationally and become fixated on financial gain. It was in this context that he robbed an electronics store on October 23, 2024. While David's offense was undoubtedly serious, he did not have a weapon, and no one was injured. In light of this, what David needs is medication and intense outpatient mental health treatment unlike any program he has previously participated in—not lengthy incarceration.

2

On March 26, 2026, David Almanzar will face this Court for sentencing in his first federal case. At that time, I intend to ask the Court to impose a sentence of 36 months' imprisonment. This sentence is more than sufficient punishment in light of David's mental illness, the nature and circumstances of the offense, and his prospects for the future in a new environment with the support of his family and intensive outpatient mental health treatment. Thirty-six months is also four times longer than David Almanzar's longest prior period of incarceration. With such a sentence, David can reunite with his family and community and begin building a better version of his life sooner rather than later.

### Thirty-Six Months of Imprisonment is the Appropriate Sentence

The parties have stipulated that David Almanzar's offense level is 19 and that he is in criminal history category VI, with a resulting Guidelines range of 63 to 78 months' imprisonment. While the Probation Department maintains that the higher Career Offender Guidelines should apply, the Guidelines range reflected in the parties' plea agreement is the most appropriate starting point.[1] But, as this Court knows, when determining an appropriate sentence, the Court must consider the Guidelines but need not abide by them. See Nelson v. United States, 555 U.S. 350, 352 (2009) ("The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable.") (emphasis in original). Here, the Guidelines do not warrant deference.

Rather, a prison sentence of 36 months for a robbery of a cellphone store where no one was physically injured, and no weapon was present is more than appropriate punishment for David Almanzar given his lengthy, documented struggle with serious mental illness, and his need for intensive treatment. Such a sentence would

---

[1] While Probation calculates a Guidelines range of 151-188 months' imprisonment based on application of the Career Offender Guidelines, the Court should give effect to the parties' plea agreement and the applicable range calculated therein. See United States v. Fernandez, 877 F.2d 1138 (2d Cir. 1989).

be consistent with the Court's obligation to "impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)," i.e., "proportionality, deterrence, incapacitation, and rehabilitation." United States v. Douglas, 713 F.3d 694, 700 (2d Cir. 2013); see also, e.g., United States v. Ministro-Tapia, 470 F.3d 137, 142 (2d Cir. 2006).

### I.     **David Almanzar's History and Characteristics Warrant Leniency**

David Almanzar was born on February 2, 1997, in the Bronx, New York. Hardly 10 years later, David would begin hearing voices and experiencing delusions. And at least for the 8 years that followed, no one around him, including adults and his own mother, noticed that he was struggling with a mental disorder.

His mother only first recognized David's mental health troubles when he was 18 years old. See Ex. A at 1. Around this time, after being beat in the head and put in solitary confinement at Rikers Island, David told her "he was hearing voices and had paranoia." See Ex. A at 1. This was the year that David was first psychiatrically hospitalized at Jacobi Hospital. Since then, David has been psychiatrically hospitalized four or five times in the community. Each of his hospitalizations has been related to acute mental crises stemming from untreated or undertreated schizoaffective disorder.

Accordingly, school was challenging for David. He was placed in special education classes for a learning disability. According to his Individualized Education Program (IEP), David struggled to read and exhibited difficulty "with higher order thinking skills, such as summarizing and making inferences." Ex. B at 1. At the time of the IEP, David was not passing any classes and, at the age of 18 years old, was reading at a 4th-grade level. Id. at 12.

Throughout adulthood, medication has made a profound difference in David's life. When adhering to his medication regimen, he is at his clearest. When David is medicated and engaged in treatment, he is stable and can participate in a daily

routine where he provides critical support and care for his loved ones, including ex-girlfriend, Shakira Lora and her son, R.L. David would begin the day by getting her son, R.L., ready for school. <u>See</u> Ex. A. He ensured R.L. packed his homework and walked him to the bus. <u>See id.</u> Once R.L left, David would return to Shakira's to help out around the house and play video games while Shakira worked. <u>See id.</u> On other days, he would visit his mom and walk with her to the grocery store. <u>See id.</u> Then in the evenings, David would pick R.L. up from school and help him with homework, read books together, and play video games together. <u>See id.</u> Such were the hallmarks of the days David took his medication—calm, stable, and a life rich with loving interactions with his family and community.

However, the days during which David is not taking his medication look very different. These days often began with him waking up on a friend's couch, or shelter bed. In the morning, he obsessively scrolls through social media. In the afternoon and evenings, he hangs around outside smoking marijuana and drinking alcohol. In his most mentally unwell moments, David's relationships with Shakira and even his mother have become volatile.[2] In her letter to the Court, David's mom describes a particularly troubling incident following his release from jail:

> About five years ago when he was released from jail, he had a moment when he didn't know anything he was doing and was speaking incoherently. He threw all his clothes away and ran into the street. He was throwing his clothes all around the room, he threw plates and things out the window, the whole situation was just bad. I had him committed to a mental hospital where he stayed for six weeks.

Additionally, David becomes easily over-fixated on needing money, more than the $900.00 a month provided to him through SSI, when he is not taking medication. Far too often, when high, mentally disorganized from his untreated schizoaffective disorder, and fueled by material desire, he commits crimes.

---

[2] <u>See</u> PSR ¶ 91.

David's twenties are peppered with robbery, larceny, and burglary[3] convictions, highlighting a specific pattern of financial anxiety imbedded in poorly managed mental illness. In 2022, David was arrested for committing a robbery of an AT&T store in Brooklyn. He was detained at Rikers before fully decompensating and being declared incompetent. He was committed to the custody of the Commissioner on Mental Health on January 19, 2023. Ex. C (Fitness to Proceed Record). He was sent to the Kirby Forensic Psychiatric Center for competency restoration. On July 11, 2023 he was declared competent and fit to proceed by the medical director at Kirby. Id. David returned to Rikers in August 2023 and was later released into the community to allow him to participate in Brooklyn's Mental Health Court, with an agreement that he would receive a non-incarceratory sentence if he successfully completed the specialized diversion court. Unfortunately, while Mental Health Court offered additional Court supervision and outpatient treatment services, the services and patient education were not at the intensive level required for someone as mentally unwell as David.  While enrolled in Mental Health Court, David disengaged with treatment, stopped taking his medication, moved out of his mother's house and began cycling through shelters and friend's couches, and returned to committing impulsive, financially motivated crimes, including the instant robbery.[4]

Now, at 29 years old, David faces his first federal conviction for conduct committed during a time when he was losing his battle with mental illness. David's childhood and lifelong struggle with serious mental illness warrant leniency.

---

[3] David's longest prior sentence was a 2-to-4-year indeterminate sentence imposed for Burglary in the third degree. See PSR ¶ 62. He was released after 9 months of incarceration in the height of the COVID-19 Pandemic.

[4] David was arrested for Attempted Robbery in the Second Degree in the Bronx on April 5, 2024. He was released on the condition that he participate in Mental Health Court. He was then arrested for the instant robbery, and he has been held at the MDC Brooklyn ever since. His Bronx case has been resolved since his detention at MDC. On November 5, 2025, David was sentenced to 3 years of prison and 5 years of post-release supervision. PSR ¶69. His Brooklyn case, PSR ¶ 67, is still pending.

## II.   The Nature of the Offense Conduct and David's Circumstances Warrant A Below Guideline Sentence

David pleaded guilty to robbing an electronics store in the Bronx, New York, on October 23, 2024. At the time of this robbery, David was not taking medication for his schizoaffective disorder. He committed this robbery as a way of satisfying his financial anxiety, which was exacerbated without his medication and his substance use disorder. In watching the surveillance footage of this robbery, it is clear that David was solely focused on addressing his perceived financial needs; notably, he did not hit or injure the store employee. No weapon was used or even present. David had absolutely no desire to injure or hurt anyone, though he understands that the victim of the offense has certainly been left with psychological injury. For this, he feels tremendous remorse. "I apologize for putting the people at the store in a harmful predicament. I'm sorry and I regret all my actions in the past and for thinking impulsively." Ex. D (David Almanzar's Letter to the Court).

Regarding David's circumstances, specifically his schizoaffective disorder, Dr. Elie Aoun, an expert in General, Addiction and Forensic Psychiatry, evaluated him and conducted a comprehensive review of his mental health treatment records over the last decade. Based on his review and observations, he has confirmed David's diagnosis of schizoaffective disorder: "Mr. Almanzar meets diagnostic criteria for schizoaffective disorder, bipolar type, a psychotic disorder whose symptoms include a combination of schizophrenia and bipolar disorder." Ex. E (Psychiatric Evaluation by Dr. Elie Aoun) at 15.

> According to the American Psychiatric Association's Diagnostic and Statistical Manual– 5th Edition (DSM5), the diagnosis is made when one experiences "an uninterrupted period of illness during which there is a major mood episode (major depressive or manic) concurrent with Criterion A of schizophrenia," with the bipolar type qualifier indicating that "a manic episode is part of the presentation. Major depressive episodes may also occur." In essence, a schizoaffective disorder, bipolar type diagnosis indicates that one simultaneously meets diagnostic criteria for schizophrenia and bipolar disorder.

Id. at 16.

Consistent with this diagnosis, Dr. Aoun reports that David has "exhibited various types of delusional thinking, including paranoid delusions, grandiose delusions, and ideas of reference (believing that neutral information broadcasted via the radio, television or songs is meant to send him messages directly)." Id. at 18.

David's mental illness has been exacerbated over the years by his abuse of drugs and alcohol. David began smoking marijuana at the age of 12 years old. He began drinking the following year at 13 years old. Id. at 13. David's use qualifies him for a diagnosis of cannabis use disorder. Id. at 15. This diagnosis distinguishes his use from the recreational use of someone who seeks a high for enjoyment or amongst friends. Dr. Aoun explains:

> It is essential to recognize that substance use disorders are not merely disorders of drug or alcohol use, instead, they are thought disorders, affecting cognitive and executive functioning processes that influence decision making related to substance use... beyond the superficial aspect of substance use disorders marked by using substances, a deeper conceptualization of such disorders involves a disorder affecting a person's decision-making abilities.

Id. at 20.

Addressing cannabis use disorder therefore requires "evidence-based medical treatment in order to achieve a state of recovery." Id. at 21.

Based on Dr. Aoun's evaluation and David's medical records, it is clear that David is seriously mentally ill and that his mental illness requires careful and intensive treatment through therapy and medication. Unfortunately for David, in October 2024, he was not taking any medications for his mental health. His lack of compliance is tied directly to his mental illness.

> [P]oor insight into one's illness is a defining trait of schizoaffective disorder…patients with schizoaffective disorder are often poorly compliant with their prescribed medications. Indeed, when one does not recognize that they are ill, they fail to appreciate the importance of taking medications that they are prescribed. This certainly applies to Mr. Almanzar who often experienced recurrence of psychopathology in the context of medication noncompliance.

Id. at 19.

Dr. Aoun also notes that David's commission of the instant offense while participating in Mental Health Court is not a sign that treatment would be ineffective at deterring future crimes, but rather a sign that treatment wasn't actually working yet. He writes:

> That David was in a mental health program "should not be understood as indicating that treatment would not reduce his risk of criminal recidivism. For clarity, it is when mental treatment leads to recovery from psychiatric pathology that the individual's risk of criminal offending decreases. In Mr. Almanzar's case, even though he was receiving treatment services, he was not in recovery, and as such, it would not be surprising that he continued to criminally offend."

Id. at 23.

Unmedicated, not in recovery, and under the influence of marijuana and alcohol, David was driven by desire and impulse when he robbed the electronics store in the Bronx. He stole electronic devices. It is, however, significant that David has never actually used or carried a firearm in connection with robberies, including the one on October 23, 2024.

Dr. Aoun opines that David's conduct in the robbery at hand is a direct result of his mental illness and substance abuse disorder.

> With the above in mind, and in examining the circumstances of the instant offense, it is evident how Mr. Almanzar's alleged actions illustrate a pattern of unserious impulsiveness and disorganized silliness, above and beyond what is typically seen in individuals engaging in such criminal conduct. Mr. Almanzar's behaviors are consistent with what can be typically seen in patients with psychosis and/or mania. His alleged behaviors do not appear to have been motivated by a calculated strategy. Rather, they reflect impulsivity, disorganized decision- making, and contextually inappropriate behavior that are consistent with the affective instability and thought process disturbances characteristic of un-treated or under-treated schizoaffective disorder.
>
> The research literature demonstrates a clear connection between untreated or under-treated psychotic or bipolar disorders and criminal acts. Given the well documented suppression of criminal recidivism risk in individuals with such disorders when they receive appropriate

> treatment, it is evident that the most effective strategy to ensure that Mr. Almanzar does not recidivate requires ensuring his recovery from mental illness. Based on this, and in light of Mr. Almanzar's drug or alcohol use history, I recommend that he fully abstains from drug or alcohol use indefinitely.

Id. at 22.

Given these circumstances surrounding David's mental health and treatment, a more lenient, below guideline sentence is warranted.

## III.    The Bureau of Prisons Cannot Provide David With Effective Mental Health Care

The Court must impose a sentence that provides "the defendant with needed . . . medical care . . . in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). For David, given his mental health issues, this factor carries particularly great weight and warrants a below Guideline sentence. The Bureau of Prisons (BOP) is unable provide effective medical care for those suffering from mental illness. The Department of Justice Office of the Inspector General found, in facility after facility, that BOP medical services cannot reliably monitor drug levels or provide timely access to specialists. At FMC Devens, a designated federal medical center, only one dedicated physician remained to care for over 900 incarcerated persons the Deputy Chief Psychologist position as well as 13 of 33 Psychology Services Department positions sat vacant, and only half of pharmacy positions were filled, leading to, among other things, potentially dangerous medication distribution. See DOJ OIG, Inspection of FMC Devens, Report No. 25-009, at i, 12 (2024). Correctional officers also "failed to complete about half of the required inmate-monitoring rounds in the housing units that [held] vulnerable inmates at the highest . . . mental health care levels" and facility spaces designed to develop those with serious mental illnesses "had yet to be used . . . since its construction 3 years prior to [2024].". Id. at ii. At FCI Lewisburg, the clinical director was abruptly discontinuing mental health medications, creating severe psychiatric risks, and not meeting with incarcerated persons regularly enough to make sound prescription decisions and keep them

informed. See DOJ OIG, Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Lewisburg, Report No. 24-113, at 11–12 (2024). Generally, BOP's staffing shortages limit their ability to provide treatment for mental health needs and substance abuse disorders. See DOJ OIG, Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions, Report No. 24-041, at 65 (2024). BOP does not adequately address or monitor incarcerated persons with mental illness in restrictive housing. See DOJ OIG, Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness, Report No. 17-05, at 15 (2017). BOP's mental health staff do not consistently document incarcerated persons' mental disorders, leaving BOP unable to "accurately determine the number of its inmates who have mental illness," preventing appropriate care. Id. at 34.

Not only is the BOP poorly equipped to manage David's treatment, the nature of the carceral setting itself exacerbates David's mental illness. Dr. Aoun also opines that living in a setting where he constantly feels unsafe only exacerbates David's paranoia and delusions, and complicates his path to recovery:

> Carceral settings are ripe with situations that would trigger patients with psychotic tendencies to feel afraid or otherwise unsafe, which would trigger, perpetuate, or heighten the severity of their paranoid delusions. The tension, safety concerns, fights, restrictions of movement and general curtailing of personal freedoms present in jail or prison settings will worsen Mr. Almanzar's schizoaffective disorder symptoms, and reduce the likelihood that he achieves a state of recovery. When Mr. Almanzar is living in an environment where he fears for his physical safety (regardless of whether such fears are based in reality or in a paranoid delusional construct), his psychotic symptoms will be reactivated. Even if Mr. Almanzar were to receive evidence-based psychiatric treatment in a carceral setting, the constant reactivation of his schizoaffective disorder symptoms will prevent him from fully benefiting from the treatment. As such, incarceration will be detrimental to the overarching goal of reducing the likelihood that Mr. Almanzar will recidivate criminally.

Ex. E at 24.

11

David has often been a target at the MDC and has had trouble conforming his conduct to what is expected or socially appropriate.[5] His mother notes the struggles he has experienced in her letter of support. Ms. Almanzar writes, "It has been really hard for David to be at the MDC Brooklyn because the people there always want to beat him up and steal his food. When he's with other prisoners they don't understand his mental health problems. He needs to be in a different program where they can treat his mental health problems." Ex. A at 1.

Prison's limitation on David's recovery is well documented in research as well. Incarcerated persons with serious mental illness frequently experience lengthy periods of solitary confinement, with "the average male prisoner with serious mental illness [spending] three times longer in solitary confinement compared with a similar man with no history of mental illness."[6] This is mostly a result of "the large number of misconduct tickets written by prison staff to mentally ill prisoners."[7] Another study found that incarcerated persons with mental illness were found to be "at greater risk of being placed in [disciplinary confinement]," with the severity of mental health issues being correlated to the risk.[8] Moreover, "the use of [disciplinary confinement] has a negative impact on the mental state of inmates,"[9] resulting in a cycle of punishment for incarcerated persons with mental illness.

---

[5] David's repeated infractions are proof of his difficulty managing his mental illness and conforming his conduct to what is socially acceptable inside a carceral setting. See ¶ PSR 6.

[6] Jessica T. Simes, Bruce Western & Angela Lee, Mental Health Disparities in Solitary Confinement, 60 CRIMINOLOGY 538, 558 (2022).

[7] Id. at 558–59.

[8] Sabrina Giguère, Laura Dellazizzo, Charles-Édouard Giguère & Alexandre Dumais, Association Between Mental Illness and Disciplinary Confinement and its Effect on Mental Health: A Systematic Review and Meta-Analysis, PLOS ONE, June 10, 2025, at 1, 9 (2025).

[9] Id.

IV.    **A Sentence of Thirty-Six Months Followed by A New Living Environment and Comprehensive Treatment Would Provide Sufficient Deterrence**

Because David's offense conduct is a product of unmedicated schizoaffective disorder, it cannot be remediated through lengthy incarceration in federal facilities that can barely address the needs of its most well occupants. In the article titled *Treatment Denied: The Mental Health Crisis in Federal Prison*,[10] the Marshall Project reports that the BOP has been able to help fewer incarcerated persons with psychiatric services despite new policies. With pervasive understaffing in the BOP, there is little hope that David would be able to receive consistent, quality care and treatment in federal custody. A lengthy prison sentence would mean David would have to wait longer to receive the type of mental health services and support that would allow him to make better decisions in the future and reduce his risk of recidivism.

More broadly, studies have shown that imprisonment isn't a very effective deterrence mechanism. Empirical research confirms what many involved in the criminal justice system already suspected—that prison is criminogenic and that long sentences—even for repeat offenders—can be counterproductive while **less severe sanctions can lead to lower risks of recidivism**.[11]

---

[10] "Treatment Denied: The Mental Health Crisis in Federal Prisons," The Marshall Project, (Nov. 21, 2018), available at:
https://www.themarshallproject.org/2018/11/21/treatment-denied-the-mentalhealth-crisis-in-federal-prisons?ref=hp-1-10

[11] See Daniel P. Mears & Joshua C. Cochran, Progressively Tougher Sanctioning and Recidivism: Assessing the Effects of Different Types of Sanctions, J. of Research in Crime & Delinquency at 35 (2017) ([A]nalyses of second-time felons did not clearly support the hypothesis that progressions to more severe types of sanctions would decrease recidivism. They did so for 4 of 12 progressions and had no effect on one other; in the remaining 7, progressions to less severe sanctions—especially probation and intensive probation—were associated with a lower probability of recidivism.").

13

Rather than lengthy incarceration, David needs mental health and substance abuse treatment in a more supportive environment. Fortunately, that is exactly what awaits David in the Single Point of Action (SPOA) program proposed by Federal Defenders of New York Social Worker Ms. Taylor Eutsey, in the treatment-focused reentry plan that she created for David. Ex. F (Federal Defenders Mitigation and Reentry Plan). While David was previously unsuccessful in completing his Mental Health Court program from his prior state convictions, that program was distinct from the SPOA program we now propose. While the former provided regular check-ins and some treatment support, it failed to add the degree of structure and hands-on, community-based support that David needs to successfully manage his diagnosis. SPOA is unlike David's prior outpatient treatment programs—it is more intensive, more mobile, and encompasses closer supervision. Ms. Eutsey explains:

> The Single Point of Access (SPOA) program offers a fundamentally different level of care. SPOA is designed specifically for individuals living with serious and persistent mental illness who require comprehensive, coordinated, and long-term support. It is not a single service but a system of wraparound care that integrates mental health treatment, substance use services, case management, and functional support.
>
> Through SPOA, Mr. Almanzar will receive intensive case management that coordinates all aspects of his care. A dedicated case manager will assist with scheduling and attending appointments, monitoring medication adherence, and ensuring consistent engagement in treatment. This level of oversight will reduce the likelihood of missed appointments, medication lapses, or disengagement from services.
>
> SPOA will also facilitate referral to a dual-diagnosis outpatient treatment program specifically equipped to address both schizoaffective disorder and substance use simultaneously. Integrated dual-diagnosis treatment is widely recognized as the most effective approach for individuals whose psychiatric symptoms and substance use are interconnected. Research demonstrates that individuals receiving coordinated treatment for both conditions experience

14

> improved stability, reduced relapse rates, and greater long-term functioning (Drake et al., 2008).
>
> In addition to clinical treatment, SPOA provides assistance with daily living and community functioning. Case management support will help Mr. Almanzar navigate benefits systems, maintain appointments, and develop routines that support stability. This level of structured, sustained engagement represents a significant departure from the fragmented services he has previously received and provides the comprehensive framework necessary for long-term stabilization.

Ex. F at 5–6.

SPOA and our reentry plan will be substantially more effective for David's recovery with the additional income and employment support we propose. Income support will be established through re-enrolling for Supplemental Security Income. Re-establishing Social Security Administration benefits is critical to David's recovery, as financial insecurity can "significantly exacerbate psychiatric symptoms," especially in David's case. Id. at 6. With respect to employment support, we propose the Adult Career and Continuing Education Services – Vocational Rehabilitation (ACCES-VR) program. ACCES-VR is a state-wide program that provides vocational training, career counseling, GED Assistance, job placements services and more *specifically* for individuals with disabilities, including serious mental illness. As Ms. Eutsey notes:, "ACCES-VR provides structured, individualized support rather than expecting independent navigation of complex employment systems." Id. at 7.

Additionally, David's perspective and living circumstances have improved since his participation in the Mental Health Court Program. First, he is now truly committed to his rehabilitation. He is currently studying for his GED. He has also expressed a desire to engage in supplemental programming, especially those focused on parenting. Second, once released, David will live with his mother and stepdad, with whom he still maintains a great relationship. This will provide him with a structured environment as he re-engages in treatment services. His mother

and stepdad are ready to support him and help him following his treatment-focused reentry plan: "When David is released from jail, he would be able to live with me and my husband in the Bronx for as long as he needs. He has his own things in the house, his room his clothes and everything. I would also be there to personally drop him off at his mental health treatment programs or any programs that he needs to do." Ex. A.

Most importantly, David has expressed a clear interest in engaging in the appropriate treatment and services necessary to promote stability in his life post-release.

> [David] has expressed willingness to participate in treatment and has demonstrated an understanding that structured mental health and substance use support is essential for his stability. This engagement reflects a meaningful shift toward accepting help and represents a strong indicator that he can benefit from comprehensive community-based services.

Ex. F at 5.

## Conclusion

David Almanzar is a young man who has suffered from serious mental illness all of his life. Unfortunately, he lacked support during his most formative years, in childhood, and more recently, when he lacked access to an intensive mental health treatment program like SPOA. When undertreated and unmedicated, David too often engaged in dangerous, reckless conduct like the instant robbery. But he is ready for a change and a fresh start. A 36-month sentence would allow David to embark on this fresh start with family and community-based treatment sooner rather than later. With proper intensive mental health and substance abuse treatment, a new environment, and his family's support, David will be able to live a law-abiding life moving forward.

16